### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MAGGIE CHIU ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | Div. |
| NEW DIRECTIONS ) | |
| BEHAVIORAL HEALTH, L.L.C. ) | |
| *Serve Resident Agent*: ) | |
| *New Directions Behavioral* ) | |
| *Health, L.L.C.* ) | |
| *6100 Sprint Pkwy, Suite 200* ) | |
| *Overland Park, KS 66211* ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff Maggie Chiu, by and through her counsel of record, for her Complaint, alleges and states as follows:

## PARTIES

1. Plaintiff Maggie Chiu ("Plaintiff") is a resident of Johnson County, Kansas.

2. Defendant New Directions Behavioral Health, L.L.C. ("Defendant") is a limited liability company licensed to do business in Kansas and that regularly transacts business in Kansas. Defendant can be served via its Kansas Resident Agent, at 6100 Sprint Pkwy, Suite 200, Overland Park, Kansas 66211.

3. At all times relevant to this Complaint, Defendant was subject to and a covered employer under the ADA and the FMLA.

4. All of the acts, conduct, or omissions by Defendant were performed by its agents, representatives, managers, and employees while in the course and scope of their agency or employment.

## NATURE OF ACTION

5. Plaintiff is a former employee of Defendant.

6. Plaintiff seeks relief for discrimination and retaliation she suffered with regard to the terms and conditions of her employment with Defendant following Plaintiff's diagnosis of certain physical and mental impairments that resulted in her disabilities, as more fully set forth herein.

7. Defendant's discriminatory and retaliatory conduct violated Plaintiff's rights as protected under Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, (the "ADA"), the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq., (the "FMLA"), and Kansas common law.

8. Together, Plaintiff seeks actual, liquidated and compensatory damages, punitive damages, and reasonable attorney's fees and costs as remedies for Defendant's violations of her rights.

## JURISDICTION AND VENUE

9. This Court has primary jurisdiction pursuant to 28 U.S.C. § 1311 because Plaintiff's claims are brought pursuant to federal law, more specifically, the ADA and the FMLA.

10. This Court has supplemental jurisdiction over Plaintiff's Kansas tort claims, if any, pursuant to 28 U.S.C. § 1367(c).

11. Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. § 2601, et seq., and 28 U.S.C. § 1391, because Defendant transacts business in, and maintains a place of business in this District.

12. At all times relevant herein, Defendant had over 500 employees and is therefore a covered "employer" within the meaning of the ADA and the FMLA.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13. As a result of the unlawful employment practices alleged here, on **July 13, 2020**, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which is attached as Exhibit A.

14. While the EEOC conducted its investigation, on **July 30, 2020**, Plaintiff filed an Amended Charge of Discrimination with the EEOC, which is attached as Exhibit B.

15. Plaintiff's original Charge and Amended Charge culminated into a "Notice of Right to Sue" letter issued by the EEOC, which was mailed on **August 12, 2020** and received by Plaintiff on **August 16, 2020**. The letter is attached as Exhibit C.

16. Plaintiff is filing this suit within 90 days of Plaintiff's receipt of the Notice of Right to Sue letter and therefore this suit is timely filed.

17. Plaintiff exhausted all administrative remedies prior to filing this suit.

18. When relevant, Defendant's conduct here constituted a continuing violation of Plaintiff's federally protected rights stated here.

## FACTUAL BASIS

19. Plaintiff Maggie Chiu is a 30 year old Asian American women, resident of Kansas, with a Masters Degree in Clinical Social Work from the University of Kansas.

20. Defendant New Directions Behavioral Health is a managed care company, claiming to manage behavioral health regarding insurance, employing over 500 employees. Defendant claims to deliver services to over 16 million people nationwide. Defendant's business either approves or denies a patient's mental health claims on all levels of care, primarily for the benefit of insurance companies.

21. Plaintiff was first hired by Defendant on October 17, 2016.

22. From October 17, 2016 until June 17, 2020, when she was terminated, Plaintiff served as a utilization manager.

23. As a utilization manager, Plaintiff's duties were to provide utilization management to all levels of care, including residential, inpatient, partial, and intensive outpatient. She also implemented the Medical Necessities Criteria when authorizing care, in conjunction with demonstrating clinical skills, to provide best care for members. Finally, she coordinated with an interdisciplinary staff, including physicians, nurses, and clinicians, for purposes of discharge planning and continued authorizations.

24. On or about September 16, 2019, Plaintiff took an eleven week absence through FMLA, due to worsening mental health symptoms related to chronic depression and anxiety, caused from unbearable and out-of-ordinary high case work-loads, and personal life issues.

25. Plaintiff was cleared by her healthcare providers to return to work and did return to work on or about December 2, 2019.

26. Immediately upon returning to work, Plaintiff was burdened with a heavy workload, which consistently was twice or three times the expected, recommended or required case load for other employees similarly situated.

27. Despite making several requests to her supervisor to take into account her health issues and to lower her case load to, at a minimum, the expected or recommended load, Plaintiff was rebuffed and told "she would be ok" or to make sure she hit her daily quota.

28. Plaintiff was forced to manage approximately 20 to 30 cases per day, when the average that other employees were expected to hit was 12 cases per day.

29. Plaintiff routinely was forced to work way past 5pm, and at times working until 8pm or later, or to log in over the weekend to finish non-urgent cases.

30. Plaintiff routinely expressed to management that she could not continue to have such high caseloads, when it was clear that Plaintiff's other co-workers had lists of patients that were half of Plaintiff's caseload.

31. Soon after returning to work, as a result of the unusual high workload and Defendant's refusal to accommodate her, Plaintiff was forced to use 8 additional PTO days, which were days Plaintiff had in her PTO bank.

32. Despite Defendant's failure to accommodate her, Plaintiff continued to work and do her best to keep up with her higher than normal caseloads.

33. At some point, Plaintiff was told by some members of management to just hit her daily quota of 12, and to let the other patients and cases slide, so upper management could see and realize that Plaintiff's caseload was too high. Nonetheless, Plaintiff's caseload, not only was unusually high (compared with her co-workers'), the large majority of her caseload, consisted of urgent cases with a 24-hour turnaround rate. If they were not completed timely, Defendant's own policy required that Plaintiff be written up.

34. The amount of urgent cases on her daily caseload were consistently above 12, sometimes 20 or more. Plaintiff, in accordance with Defendant's own policies, could not therefore "let some of them slide."

35. Plaintiff was also asked to document her daily cases completed, both urgent and non-urgent cases, which Plaintiff did daily.

36. Throughout this time, Plaintiff's health condition deteriorated.

37. On or about April 6, 2020, after a day where Plaintiff had completed 30 cases, she informed management that she would not be in the next day, as she needed the following day for a mental health day. Plaintiff still had available PTO hours in her bank, which she intended to use.

38. Plaintiff in fact took two mental health days, covered by her available PTO.

39. Nonetheless, upon returning to work after taking her 2 PTO days, Plaintiff was told that she would be given a final warning, with "probable cause to fire" if she were to take any additional time off, despite utilizing her own PTO for all her time taken off. Plaintiff was capriciously placed on "disciplinary action through a behavioral plan."

40. Plaintiff was also told that if she wished to use her remaining and available PTO, that she would have to submit a request to Defendant two weeks in advance or she would be fired.

41. Plaintiff gave Defendant a note from her therapist, which indicated that Plaintiff's mental health was decompensating, and consequently Plaintiff needed special accommodations.

42. Defendant ignored the therapist's note and did not take it into consideration.

43. Throughout this time, Plaintiff had continued to maintain her case load, which at times, despite her health diagnosis, was twice or three times the expected, recommended or required case load for other employees similarly situated.

6

44. Prior to the early April 2020 "final warning", Plaintiff had never been given a warning of any kind.

45. Following the early April 2020 "final warning", Plaintiff was placed on a behavioral plan. Any mistakes (even small or easily correctable) that Plaintiff could make on any of her significantly higher than usual caseload, were kept from her for weeks, despite having supervision meetings weekly with Plaintiff's supervisor. These small mistakes were then brought up by Plaintiff's manager, where Plaintiff would be informed of small mistakes made weeks prior.

46. On these occasions, Plaintiff's manager would use these alleged mistakes to disparage Plaintiff and be verbally abusive to Plaintiff in the presence of others.

47. These "trap" meetings added to the stress and anguish being placed on Plaintiff, causing her mental health to deteriorate further.

48. Throughout, Plaintiff's reasonable requests for accommodation (asking that her caseload not be twice or three times that of her co-workers) were routinely ignored.

49. Throughout all relevant time, Defendant was aware that Plaintiff had been diagnosed with complex PTSD due to severe childhood trauma. Such diagnosis was given to Plaintiff in October 2019.

50. Despite having this knowledge, Defendant refused to accommodate Plaintiff.

51. By the end of April 2020, and for much of May 2020, Plaintiff experienced a mental health set-back that brought many of the horrifying childhood memories to return. These memories, coupled with the work related high stress, caused Plaintiff's mental health to fast deteriorate.

52. For example, during this particular period, Plaintiff started having severe panic attacks, sometimes having multiple attacks in a single day. Yet, throughout this arduous period,

7

not a single customer or client working with Plaintiff complained about the quality of her work, her ethics, or abilities.

53. To cope with her panic-attacks, Plaintiff would take short breaks throughout the day to compose herself; while continuing to meet her demands at work.

54. In May 2020, Plaintiff was further diagnosed with panic disorder, and started having dissociative episodes, where amnesia occurred. These episodes would usually last for minutes, but on two occasions, they lasted for days.

55. Despite these disabilities, and despite the fact that Plaintiff made reasonable requests to Defendant to accommodate her and reduce the significantly higher caseload,, Defendant chose to ignore Plaintiff's requests, and instead threatened to fire her.

56. Due to these disabilities and the added stress placed on her by Defendant, Plaintiff began the necessary paperwork to request unpaid leave, as Plaintiff did not want to have one of her more serious episodes occurring while at work.

57. Plaintiff, as a licensed clinician, did not want to jeopardize her license for any potential errors that her panic attacks and dissociative episodes could cause.

58. Plaintiff's overall symptoms were exacerbated by the added caseload and work-related stress.

59. Plaintiff was continuously plagued with panic attacks, anxiety, depression, disassociation, suicidal thoughts, negative self-worth, hopelessness, racing thoughts, difficulty concentrating, and memory loss.

60. On June 1, 2020, Plaintiff requested nine weeks time-off, due to worsening mental health issues directly related to her substantially higher than recommended or required caseload.

61. Despite being aware of Plaintiff's well documented condition, Defendant demanded that Plaintiff provide new physicians statements and FMLA paperwork to Human Resources by June 12, 2020.

62. Plaintiff complied with the request and submitted the requisite documentation and paperwork well before the deadline of June 12, 2020, containing psychiatric and therapeutic recommendations issued by her healthcare providers and treaters, that Plaintiff be given nine weeks off due to her worsening symptoms.

63. Despite submitting the proper medical statements and requisite documentations, Defendant told Plaintiff that her request was denied by Human Resources, and that Plaintiff needed to return to work by June 15, 2020 with a "signed physician's note clearing her to return to work (even though Defendant was aware that Plaintiff's physician had recommended the opposite), or she would be terminated.

64. Plaintiff then attempted three times to request an interactive discussion with Defendant, requesting unpaid leave as a reasonable alternative and accommodation through the ADA.

65. Only after making three unsuccessful attempts and upon referencing her legal rights, due to previous short-term disability, did Defendant granted Plaintiff an audience.

66. On June 16, 2020, Defendant held a skype meeting for the requested interactive discussion. Plaintiff was then informed that Defendant had already hired two additional utilization managers to replace Plaintiff's caseload, and that allowing an additional 9 weeks' leave would be a "financial hardship" for Defendant, despite the fact that Plaintiff's requested leave would be **without pay**. Her request for unpaid leave was denied.

9

67. Plaintiff was again instructed to provide physician documentation clearing her to promptly return to work full-time by June 18, 2020, or Plaintiff would "forfeit her position and be terminated."

68. The following day, June 17, 2020, Plaintiff informed Defendant that she would not be able to provide the requested physician's note, primarily because her physicians and therapists had recommended the exact opposite. Plaintiff informed Defendant that instead, she would be following the recommendations and treatment plan advanced by her healthcare physician and therapists.

69. Consequently, Defendant acted on its earlier issued threat and terminated Plaintiff's employment.

70. When Plaintiff later attempted to apply for unemployment, however, her application was denied because Defendant had reported Plaintiff as having "quit with no explanation."

71. Defendant's representation was false.

72. As a result of Defendant's false representation to the State Employment Agency, Plaintiff was further harmed and refused unemployment assistance during a national pandemic.

73. Plaintiff was capriciously denied both FMLA and unpaid leave.

74. Defendant further refused to make reasonable accommodations for Plaintiff and her well documented disabilities.

75. Defendant's conduct was at variance and in violation of the ADA and FMLA.

### COUNT I – Disability Discrimination in Violation of the ADA

76. Plaintiff restates and incorporates all of the above paragraphs 1 through 75 of this Complaint as though fully set forth here.

77. Plaintiff is a qualified individual with disabilities, first diagnosed with complex PTSD due to severe childhood trauma in October 2019. Plaintiff was later further diagnosed with chronic panic disorder and dissociative amnesia.

78. As alleged here, Plaintiff's disabilities substantially limit one or more of Plaintiff's major life activities.

79. As alleged here, Plaintiff has a record of said disabilities and she has been perceived by Defendant to have a disability.

80. Plaintiff is a disabled individual protected by the provisions of the ADA.

81. At all times relevant here, Plaintiff was subjected to discriminatory treatment during the course of her employment by Defendant, by and through Defendant's agents and employees, on the basis of Plaintiff's disabilities, where Defendant failed to provide Plaintiff with reasonable accommodations and eventually terminated Plaintiff because of her disabilities. Moreover, Defendant not only refused to accommodate Plaintiff, it burden Plaintiff with above normal or substantially unreasonable caseload, unlike any other employee similarly situated, causing Plaintiff's disabilities to be exacerbated.

82. Defendant knew or had reason to know of the disability discrimination stated here and failed to take prompt and effective actions to remedy the situation. On the contrary, Defendant actively made things worse for Plaintiff, by demanding she handle twice the workload as Plaintiff's coworkers, further causing Plaintiff's health and disabilities to worsen.

83. Plaintiff suffered adverse employment actions, including constructive or actual discharge.

84. Defendant discriminated against Plaintiff with respect to the compensation, terms, conditions, and privileges of Plaintiff's employment on the basis of Plaintiff's disabilities, including constructive or actual discharge.

85. As a result of said actions by Defendant, Plaintiff has suffered damages.

86. Plaintiff has been damaged by Defendant's illegal conduct in that she has suffered mental and emotional distress and economic damages.

87. Defendant's conduct was outrageous and showed an evil motive or reckless indifference or conscious disregard for Plaintiff's rights and therefore, punitive damages are warranted against Defendant to punish and deter it from such conduct.

WHEREFORE, Plaintiff Maggie Chiu prays for judgment against Defendant New Directions Behavioral Health, L.L.C., for her compensatory and punitive damages in an amount in excess of $75,000 that is fair and reasonable, including but not limited to, lost income, fringe benefits, costs, attorney's fees, and any and all other relief available pursuant to the ADA, as well as other relief this Court may deem just and proper.

## COUNT II – Failure to Accommodate in Violation of the ADA

88. Plaintiff restates and incorporates all of the above paragraphs 1 through 87 of this Complaint as though fully set forth here.

89. Plaintiff is a qualified individual with disabilities.

90. Defendant had notice of Plaintiff's disabilities.

91. With reasonable accommodations, which included but were not limited to giving Plaintiff a lighter workload, Plaintiff could perform the essential functions of her position.

92. Defendant refused to make any accommodations.

93. Plaintiff has been damaged by Defendant's illegal conduct in that she has suffered damages, including economic damages and mental and emotional distress.

94. Defendant's conduct was outrageous and showed an evil motive or reckless indifference or conscious disregard for Plaintiff's rights and therefore, punitive damages are warranted against Defendant to punish and deter it from such conduct.

WHEREFORE, Plaintiff Maggie Chiu prays for judgment against Defendant New Directions Behavioral Health, L.L.C., for her compensatory and punitive damages in an amount in excess of $75,000 that is fair and reasonable, including but not limited to, lost income, fringe benefits, costs, attorney's fees, and any and all other relief available pursuant to the ADA, as well as other relief this Court may deem just and proper.

### COUNT III – FMLA Retaliation/Discrimination

95. Plaintiff restates and incorporates all of the above paragraphs 1 through 94 of this Complaint as though fully set forth here.

96. Plaintiff gave notice of her need for leave pursuant to the FMLA.

97. Plaintiff utilized leave pursuant to the FMLA.

98. Plaintiff exercised her rights pursuant to the FMLA, thereby engaging in protected activity under the FMLA.

99. At all times relevant hereto and as alleged here and above, Defendant took materially adverse employment actions against Plaintiff, including constructive or actual discharge. Said adverse treatment of Plaintiff occurred during the time frame that Plaintiff requested and/or utilized FMLA leave.

100. Defendant's treatment of Plaintiff and adverse employment actions against Plaintiff occurred because Plaintiff engaged in protected activity under the FMLA.

101. Said conduct on the part of Defendant was discriminatory and retaliatory under the FMLA.

102. Plaintiff has been damaged by Defendant's illegal conduct in that she has suffered economic damages.

103. Defendant's conduct were willful and taken in bad faith and therefore liquidated damages are warranted against Defendant to punish and deter it from such conduct.

WHEREFORE, Plaintiff Maggie Chiu prays for judgment against Defendant New Directions Behavioral Health, L.L.C., for her compensatory and liquidated damages in an amount that is fair and reasonable, including but not limited to, lost income, fringe benefits, costs, attorney's fees, and any and all other relief available pursuant to the FMLA, as well as other relief this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which Plaintiff has a right to a jury trial.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby designates Kansas City, Kansas as the place of trial in this case.

Dated: September 17, 2020                                        Respectfully submitted,

_____
Marcos A. Barbosa            KS #22015
**MABLAW-KC**
4707 Roe Pkwy, Suite 100
Roeland Park, KS 66205
Telephone:    (816) 499-8800
Facsimile:     (816) 499-8801
marcos.barbosa@mablawkc.com
ATTORNEY FOR PLAINTIFF